**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| **WANDA L. MOORE,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CAUSE NO. 1:14-cv-00293-SLC** |
| ) | |
| **COMMISSIONER OF SOCIAL** ) | |
| **SECURITY, sued as Carolyn W.** ) | |
| **Colvin, Acting Commissioner of** ) | |
| **Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## OPINION AND ORDER

Plaintiff Wanda L. Moore appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying her application under the Social

Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI").[1]  (DE 1).  For the following reasons, the Commissioner's

decision will be AFFIRMED.

## I.  PROCEDURAL HISTORY

Moore applied for DIB and SSI on May 4, 2011, alleging disability as of July 1, 2008.

(DE 11 Administrative Record ("AR") 213-14, 220-29).  Her DIB-insured status expired on

December 31, 2008 (AR 22, 106), so with respect to her DIB application, she must show that she

was disabled on or before that date.  *See Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir.

1997).

The Commissioner denied Moore's application initially and upon reconsideration.  (AR

---

[1] All parties have consented to the Magistrate Judge.  (DE 15); *see* 28 U.S.C. § 636(c).

110-24, 131-35). After a timely request, a hearing was held on April 9, 2013, before

Administrative Law Judge Maryann S. Bright ("the ALJ"), at which Moore, who was

represented by counsel; Moore's husband; and a vocational expert, Amy Kutschbach (the "VE"),

testified. (AR 43-103). On May 23, 2013, the ALJ rendered an unfavorable decision to Moore,

concluding that she was not disabled because despite the limitations caused by her impairments,

she could perform her past relevant work as a press operator and hand packager, as well as a

significant number of other light work jobs in the economy. (AR 22-34). The Appeals Council

denied Moore's request for review (DE 1-18, 315-23), at which point the ALJ's decision became

the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481.

Moore filed a complaint with this Court on September 23, 2014, seeking relief from the

Commissioner's final decision. (DE 1). Moore argues that the ALJ: (1) failed to adequately

account for the ALJ's step-three finding that Moore had moderate limitations in concentration

persistence, or pace when crafting the residual functional capacity ("RFC") and the step-five

hypotheticals; (2) failed to consider her impairments in combination, in particular her obesity

and mental problems; and (3) improperly discounted the credibility of her symptom testimony.

(DE 16 at 2-9).

## II. FACTUAL BACKGROUND[2]

At the time of the ALJ's decision, Moore was 44 years old (AR 208), had a high school

education (AR 50, 274), and had past work experience as a driver and machine/press operator

(DE 274). She alleges disability due to type II diabetes mellitus and peripheral neuropathy, low

back pain, obesity, multiple foot surgeries, major depression, and a personality disorder. (DE 16

_____

[2] In the interest of brevity, this Opinion recounts only the portions of the 793-page administrative record
necessary to the decision.

at 2).

       At the hearing, Moore, who was five feet, five inches tall and weighed 213 pounds at the time, testified that she lives with her husband and their two teenage children.  (AR 49).  Moore cares for their pets and occasionally cooks, does the dishes, and grocery shops, but her husband and daughter do most of the household chores.  (AR 64, 75-76, 91).  She occasionally transports the children to school activities, and she drives short distances about once a week.  (AR 50, 73).  She is insured through the Healthy Indiana Plan.  (AR 49).

       Moore stated that she quit the only full-time job she ever had because she had babysitter problems and "it was close to school getting out."  (AR 56).  When asked what prevents her from working, Moore stated that her feet hurt and she cannot stand for more than 20 minutes at a time.  (AR 57-58).  She also complained of pain in her back, hips, and left knee, which started in 2012.  (AR 68-69).  She alleged that she cannot get comfortable when sitting.  (AR 70).  She said that she does not have much strength in her hands and can barely lift a case of water.  (AR 63-64, 71).  She stated that her diabetes medications are effective, denying any medication side effects.  (AR 61).  She claimed that she was always compliant with taking her medication, except for a few months when she lost her health insurance in 2013.  (AR 61).  She admitted that she does not check her blood sugar regularly, but asserted that she can tell whether it is high or low by how she feels.  (AR 61-63).

       When asked about her depression, Moore stated that she does not leave home unless she has to and that she has at least three bad days a week.  (AR 73, 79-80).  She said that most days she does not even get dressed; she does not like to talk with others and prefers to be left alone.  (AR 74-75, 78, 81-82).  She said that she has difficulty concentrating for very long on any

activity, including watching television (AR 75); however, on her function report, Moore

represented that she could manage her finances and that her hobby is reading (AR 285).  Moore

further testified that she was taken to the emergency room in January 2013 after she got angry at

her husband and emptied a bottle of pills into her mouth; she did not swallow the pills, however,

and was not admitted.[3]  (AR 65).

     *A.  Summary of the Medical Evidence Prior to Moore's DIB Date Last Insured*

In May 2006, Moore was evaluated by Dr. Stephen Beyer, an endocrinologist, for her

diabetes; she told him that she had been feeling well.  (AR 366).  She did not complain of any

foot problems, but she did have some decreased sensation to light touch in her feet; she also

reported some numbness and tingling in her fingers.  (AR 366).  He assessed diabetes mellitus

with neurological manifestations, type II, or unspecified type, uncontrolled; pain in limb; other

unspecified hyperlipidemia; benign essential hypertension; and obesity.  (AR 367).

The following month, Dr. Beyer noted that Moore felt good and that her feet were

"okay," with less burning sensations.  (AR 360).  In September, Dr. Beyer wrote that Moore had

not been taking her blood pressure medications because she had run out.  (AR 357).  In

December, Dr. Beyer's physical exam findings reflected that Moore's feet were "okay," but that

she had "[s]ensory reduced toes."  (AR 353).  She had lost 20 pounds since May.  (AR 353).  She

told Dr. Beyer that the numbness and tingling in her feet had lessened, but was still present,

stating that the Amitriptyline was helping.  (AR 353).

In March 2007, Moore told Dr. Beyer that she felt worse than at her last visit, noting

---

[3] Moore's husband also testified at the hearing, essentially corroborating Moore's testimony.  (AR 82-88).
He added that in the past five years, Moore has had about six episodes of threatening to harm herself, but was never
hospitalized.  (AR 84-85, 91).  He stated that she does not go to counseling unless he is there to make her go.  (AR
85).

more pain, discomfort, and mood changes. (AR 350). Dr. Beyer observed that Moore's feet looked "okay" and had good pulses and no discoloration, but that their "sensory to light touch" was reduced. (AR 350). In May, Moore told Dr. Beyer that the Amitriptyline was no longer helpful for the numbness and tingling in her feet. (AR 347). In August, Moore reported that her weight was increasing, that she was not exercising, and that she often forgot her third Metformin dose. (AR 343). She stated that she had seen a podiatrist and had obtained new shoes with better arch support. (AR 343). In November 2007, Moore told Dr. Beyer that Pregabalan was helping her paresthesias, but the effect was wearing off in four to five hours. (AR 337). She also told him that she does not like to wear shoes because of the neuropathy and because they hurt her feet. (AR 337). She was on insulin by this time, which she planned to continue for better glucose control. (AR 337). In February 2008, Moore told Dr. Beyer that she was doing well. (AR 415). Lyrica was helping reduce the pain in her feet, although the tingling and numbness remained. (AR 415). In May 2008, Dr. Beyer noted that Moore had lost weight, but that she still had severe neuropathy, burning pain in her feet. (AR 412).

In March 2008, Moore was examined by Dr. Shuyan Wang as part of her disability application. (AR 388-89). Moore was working three hours a day at the time, driving a van. (AR 388). She told Dr. Wang that she had been on insulin for the past six months, but that she does not exercise or check her blood sugar. (AR 388). She also reported that she has constant bilateral foot pain, which Lyrica reduced to some extent, and that she could walk for only 30 minutes at a time. (AR 388). She also stated that her legs swell if she sits for a long time. (AR 389). On examination, Moore exhibited a steady gait and appeared comfortable in the seated and supine positions. (AR 389). She had trace edema in her lower legs, but no evidence of

arterial insufficiency.  (AR 390).  Her range of motion and strength were normal, although she complained of some tenderness in her right hip and ankles.  (AR 390-91).  Vibratory sensations were present in her feet, but decreased; light tough sensation in her feet was preserved, but not pinprick sensation.  (AR 391).  She was not able to walk on her toes, but could tandem walk and walk on her heels, though she was not very stable; she complained of knee and ankle pain, as well as mild low back pain, when squatting.  (AR 391-92).  She had a normal affect and an intact memory.  (AR 389).  Dr. Wang concluded that Moore could work full time in a seated or standing position, but that she may need to alternate between sitting and standing and limit standing or walking to less than 30 minutes each hour.  (AR 392).  Dr. Wang further wrote that Moore could operate foot controls; intermittently drive equipment; occasionally climb stairs and ramps, but not ropes, ladders, or scaffolding; and should avoid unprotected heights.  (AR 392).

Also in March 2008, Dr. J. Sands, a state agency physician, reviewed Moore's record and found that she could lift 10 pounds frequently and 20 pounds occasionally; stand or walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; perform unlimited pushing or pulling, other than as shown for lifting and carrying; and occasionally climb, balance, stoop, kneel, crouch, and crawl.  (AR 394-401).

In May 2008, Moore was examined by Dr. Thomas Banas, a neurologist, for her history of lower extremity dysesthesias.  (AR 404).  Dr. Banas noted shiny trophic skin changes of Moore's anterior shins, but her distal pulsations were full; she was exquisitely sensitive to any touch of her feet.  (AR 405).  Strength was 5/5 in her upper extremities, but flexion of her feet and toes was limited to 4 or 4+ due to pain; her gait was normal.  (AR 405).  She could walk briefly on her heels and toes and, with some effort, could tandem walk.  (AR 405).  A sensory

examination revealed decreased sensation to cold to mid calves circumferentially and decreased pinprick sensation to ankles circumferentially; sensation to vibration was trace in her large toes. (AR 405). Dr. Banas's impression was mixed fiber neuropathy, diabetes mellitus, obesity, mood disorder with anxiety, and chronic disruptive sleep. (AR 405).

In November 2008, Moore presented at the emergency room after she threatened to jump out of a moving vehicle. (AR 739-41). She denied suicidal intent, stating that she had been under a lot of stress lately and was just trying to scare her husband. (AR 739-41). Her mental status reflected minimal insight, appropriate and cooperative behavior, anxious mood, coherent thinking form, and fearful thought content, with fleeting suicidal ideation. (AR 743-44). Dr. Ishak diagnosed her with depression on Axis I, chronic pain on Axis III, and "limited support" on Axis IV, assigning her a Global Assessment of Functioning ("GAF") score of 45.[4] (AR 744).

*B. Summary of the Medical Evidence After Moore's DIB Insured Status Expired*

In January 2009, Moore saw Dr. Scott Karr, an orthopaedist, for a history of foot pain. (AR 733). He diagnosed plantar fasciitis; common peroneal neuritis of the lower extremity; tarsal tunnel syndrome; and equinus/foot, acquired. (AR 734). He performed several procedures the following month, including common peroneal nerve release, gastrocnemius recession, tarsal

---

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

"The American Psychiatric Association no longer uses the GAF as a metric." *Spencer v. Colvin*, No. 13-cv-1487, 2015 WL 684545, at *17 n.5 (C.D. Ill. Feb. 17, 2015) (citing Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013)). However, the medical sources of record used GAF scores in assessing Moore, so they are relevant to the ALJ's decision. *See id.* (citing *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013)).

tunnel release, and anterior tunnel release.  (AR 729).  In July 2009, Dr. Karr wrote that Moore's

foot pain was moderately improved, despite that she still complained of burning and throbbing;

he noted minimal swelling and tenderness of her toes.  (AR 720).  Dr. Karr adjusted her

medications and recommended modifying her orthotic.  (AR 720).

In February 2010, Moore went to the Northeastern Center for an emergency assessment

after she told her husband she was going to run away; she denied being suicidal or homicidal.

(AR 442).  Moore admitted that she had not been taking some of her medications.  (AR 442).

She saw Dr. Thomas Pechin, her family physician, several days later.  (AR 489).  She was

positive for a flat affect, anhedonia, visual hallucinations, hopelessness, mood swings, poor

insight, and poor judgment; however, she was negative for anxiety, compulsive behavior,

thoughts of grandiosity, increased activity, memory loss, obsessive thoughts, paranoia, attention

or concentration deficits, or suicidal ideation.  (AR 489).  Dr. Pechin assessed that Moore's

depression was under poor control.  (AR 489).

In February 2010, Moore was evaluated at the Northeastern Center upon referral of Dr.

Pechin.  (AR 437).  Moore admitted that she did not take her diabetic medication as directed.

(AR 437).  She expressed difficulty with motivation and being around others, preferring to be

left alone.  (AR 437).  She reported poor sleep; feelings of hopelessness, fatigue, and irritability;

and when taking Cymbalta, hallucinations of things running across the floor.  (AR 437).  She

also stated that she and her husband were talking about divorcing.  (AR 437).  She was assigned

a GAF of 45 and diagnosed with major depression, recurrent, moderate; and a personality

disorder, not otherwise specified.  (AR 437).  The next day she met with a counselor and

discussed her depression, as well as how her family issues were contributing to her depression.

(AR 440). Moore was a no-show for her next appointment. (AR 443).

Moore continued to see Dr. Pechin for problems with pain in her neck, low back, right arm and shoulder, legs, and feet. (AR 494, 499, 502, 507, 510, 515). In November 2010, Dr. Pechin noted that Moore had a blunted affect, anhedonia, and feelings of hopelessness; however, she had no agitation, anxiety, mood swings, memory loss, or suicidal ideation. (AR 517).

In October 2010, Dr. Jody Neer, a neurologist, examined Moore for her neuropathy and constant pain in her lower legs and feet. (AR 461). Her balance and gait were normal, and she had no motor weakness. (AR 459, 461-63). On examination, sensation to vibration was diminished in the left lower extremity but intact on the right; sensation to temperature and pinprick were diminished on the right extending up to the T4 thoracic level. (AR 463). Dr. Neer assessed chronic peripheral neuropathy and referred Moore to a pain management clinic. (AR 45, 583).

In January 2011, Moore was seen by Leah Miller, a nurse practitioner, at a pain clinic for her complaints of lower extremity pain. (AR 583). Moore rated her pain as an eight on a ten-point scale, stating that nothing makes her pain better and that wearing shoes makes it worse. (AR 583). She told Ms. Miller that she had stopped taking insulin on her own. (AR 584). On examination, her lower extremities had some mild ruddiness, and her feet were slightly cool; she had some numbness in her lower extremities bilaterally. (AR 585). Ms. Miller stressed to Moore the importance of getting her blood sugar under control to prevent neuropathy; she observed, however, that Moore seemed to have very low motivation concerning the recommendations. (AR 585).

In February 2011, Moore told Dr. Neer that her neuropathy pain had worsened in that it

was radiating "all over"; she rated the pain as an eight on a ten-point scale, stating that it was aggravated by sitting or standing.  (AR 471).  Moore stated that although Zonegran was helping, nothing eliminated the pain.  (AR 471).  Later that month, Moore went to the emergency room after experiencing arm, back, and jaw pain for several days.  (AR 747).  She was assessed with acute upper back pain, acute left arm pain, and possible atypical angina.  (AR 747).  An MRI of the lumbar spine showed multi-level spondylosis small with retrolisthesis at L3-S1.  (AR 476).

Also in February, Moore saw Dr. Pechin for her depression, which she complained was worsening.  (AR 521).  Dr. Pechin noted that Moore had symptoms of a major depressive episode in that she was experiencing anxiety, fearful thoughts, compulsive behaviors, depressed mood, diminished interest, fatigue, feelings of worthlessness, hallucinations, manic episodes, panic attacks, poor concentration, indecisiveness, restlessness, sleep disturbance, and thoughts of death.  (AR 521).  She also complained of left-sided numbness.  (AR 521).  Dr. Pechin found that Moore's diabetes was under sub-optimal control, so he doubled her Metformin dosage and urged her to exercise.  (AR 523).  She saw Dr. Pechin two more times in March for low back pain.  (AR 524, 527).

In April and May 2011, Moore returned to the pain clinic, rating her pain between an eight and a 10.  (AR 527, 580).  She was sleeping well enough with a sleep aide.  (AR 580).  She ambulated with a careful gait.  (AR 580).  She was started on methadone.  (AR 580).

In May 2011, Moore saw Dr. Pechin for a medication check and for complaints of sensitivity in her hands.  (AR 636).  Moore thought the Wellbutrin was not working, as she was more irritable and angry.  (AR 636).  She complained that her hands hurt while driving and that her fingers were very sensitive.  (AR 636).  He noted that control of her depression was sub-

optimal, but that her diabetes was stable.  (AR 638).

In June 2011, Moore underwent a physical examination by Dr. David Ringel at the request of Social Security.  (AR 559).  Moore complained of neuropathy from her knees downward with some numbness and increased sensation, as well as depression with anger issues.  (AR 559).  She admitted to Dr. Ringel that she did not check her blood sugar very often and stated that Wellbutrin was just minimally helpful.  (AR 559).  Moore estimated that she could stand for five to 10 minutes each hour.  (AR 589).  She ambulated normally and had no difficulty getting on and off the exam table, but could not stand on heels or toes and performed only a partial squat; she had some mild edema and decreased sensation to light touch and pinprick from the knees downward.  (AR 589).

In June 2011, Dr. M. Ruiz, a state agency physician, reviewed Moore's record and completed a physical RFC assessment, finding that Moore could lift 10 pounds frequently and 20 pounds occasionally; stand or walk six hours in an eight-hour period; sit for six hours in an eight-hour period; perform unlimited pushing or pulling, except as shown for lifting or carrying; and occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs, but never climb ladders, ropes, or scaffolds.  (AR 570-77).  Dr. Ruiz's opinion was later affirmed by a second state agency physician.  (AR 653).

Also in June 2011, Moore presented to the emergency room because she had run out of methadone.  (AR 753).  Later that same month, Moore returned to the pain clinic.  (AR 579).  Her sleep was satisfactory, her emotional state was pleasant, and she reported no pain at the time.  (AR 579).  The methadone, however, was making her too sleepy to drive so her dosage was reduced.  (AR 579).  Moore also saw Dr. Pechin in June 2011, reporting a significant

domestic problem; he found that she was positive for anhedonia, anxiety, hopelessness, mood swings, poor insight, and poor judgment, but negative for suicidal ideation. (AR 640). He strongly encouraged her to participate in counseling. (AR 640).

Also in June, Moore underwent a psychological evaluation by Stephanie Wade, Psy.D. (AR 564-68). Dr. Wade found that symptoms of a mood disorder were present, as Moore reported a loss of interest, psychomotor retardation, feelings of worthlessness, poor concentration, decreased appetite, hypersomnia, and fatigue; she denied any suicidal ideation. (AR 565-66). On mental status exam, Moore put forth a fair effort and was cooperative, but she was also easily distracted and inattentive to the tasks she was asked to perform. (AR 566). Her mood was depressed, and she appeared tearful and fatigued; her concentration faded significantly toward the end of the interview. (AR 566). Dr. Wade wrote that Moore needed a great deal of support from others to accomplish her daily tasks due to her physical limitations and her lack of motivation for self care; that her daily activities were simple, but her ability to sustain such efforts on a daily basis appeared substantially impaired; that when Moore had intense pain and was heavily medicated, she likely had poor memory for task instructions and poor concentration; that her frustration tolerance was adequate; and that she was likely to have good social interactions, provided that she was able to attend to the conversations. (AR 566). Dr. Wade diagnosed major depressive disorder, recurrent, severe without psychotic features, and assigned a current GAF score of 51 and a highest-past-year GAF score of 55. (AR 566).

In June 2011, Stacia Hill, Ph.D., a state agency psychologist, reviewed Moore's record and completed psychiatric review technique and mental RFC assessment forms. (AR 603-20). On the psychiatric review technique, Dr. Hill concluded that Moore had mild difficulties in

activities of daily living and in maintaining social functioning, but moderate deficits in maintaining concentration, persistence, or pace.  (AR 613).  On the narrative portion of her mental RFC assessment, Dr. Hill wrote that Moore's attention and concentration were moderately impacted, but still appeared reasonable for simple tasks.  (AR 619).  Dr. Hill further indicated that Moore could understand, remember, and carry out simple tasks within her physical limitations; relate on at least a superficial basis with co-workers and supervisors; attend to tasks for sufficient periods of time to complete them; and manage the stresses involved with work.  (AR 619).  Dr. Hill's opinion was later affirmed by a second state agency psychologist, F. Kladder, Ph.D.  (AR 652).

That same month, Moore was referred to the Northeastern Center by the Department of Child Services ("DCS") after a serious domestic incident.  (AR 647-49).  Moore reported feeling depressed and hopeless, that she sleeps most of the time, and that she cries frequently.  (AR 647).  Moore was assigned a GAF score of 50 and was instructed to participate in individual and group therapy for six months.  (AR 647-48).

In July 2011, Moore was evaluated by Dr. Sylvia Rutten, a psychiatrist at the Northeastern Center.  (AR 649).  Moore complained of side effects from Wellbutrin and stated that she had stopped taking it; she further stated that the side effects of Celexa were not as bad, but that she had also quit taking Celexa.  (AR 649).  She reported poor energy and concentration, a lack of interest in activities, and a "down" mood.  (AR 649).  A mental status examination showed fair to poor eye contact, but no paranoia or suicidal ideation; her memory was intact.  (AR 650).  Her judgment was fair, though limited.  (AR 651).  Dr. Rutten diagnosed a major depressive disorder, single episode, rule out recurrent; acute stress disorder; parent-child

relational problems; partner relational problems; and rule-out personality disorder. (AR 651). On Axis IV, Dr. Rutten noted significant family relational issues, unemployment, chronic pain, and possible legal issues. (AR 651). Dr. Rutten assigned a current GAF score of 45 to 50. (AR 651).

Also in July 2011, Moore saw Dr. Pechin for a follow up on her hip pain. (AR 642). She said that her medications were not working and that she had been experiencing hip pain for the last three to four months. (AR 642). She received an injection in her hip. (AR 644).

Moore continued to receive mental health treatment from the Northeastern Center; in September 2011, her GAF was 51. (AR 765-66). In December 2011, Moore stated that she had stopped attending therapy because she was receiving multiple services placed in her home by DCS, and thus, she did not see the need for individual therapy. (AR 760). In January 2012, the Northeastern Center issued a discharge summary stating that Moore had voluntarily terminated her treatment even though she had not met all of her goals. (AR 757). Moore's GAF score at discharge was 53. (AR 756).

Moore saw Dr. Pechin frequently in 2012 for painful feet, erratic sleep, knee problems, and fatigue as a side effect of methadone. (AR 667, 681, 686, 689, 692, 696, 699, 703, 706, 710, 713). In November, Moore rated her pain as a seven, stating that going shopping on Black Friday caused her a mild increase in pain. (AR 656). She told Dr. Pechin that she was taking her medications as ordered. (AR 656).

In October 2012, the police brought Moore to the emergency room after she put a handful of pills in her mouth but did not swallow them. (AR 768). She denied suicidal or homicidal ideation, stating that she was angry at her husband and was trying to get his attention. (AR 768).

She was not admitted and was instructed to follow up with the Northeastern Center. (AR 768).

In 2013, Moore saw Dr. Pechin for knee problems. (AR 776, 780, 790). An MRI of the right knee showed chondromalacia of the medial femoral condyle and patella femoral joint. (AR 780).

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citation omitted).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted). "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

# IV. ANALYSIS

## A. The Law

Under the Act, a claimant is entitled to DIB or SSI if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted); 20 C.F.R. §§ 404.1520, 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (citation omitted). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* (citation omitted). The burden of proof

---

[5] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

lies with the claimant at every step except the fifth, where it shifts to the Commissioner.

*Clifford*, 227 F.3d at 868 (citation omitted).

*B. The Commissioner's Final Decision*

On March 19, 2014, the ALJ issued the decision that ultimately became the

Commissioner's final decision. (AR 22-34). The ALJ noted at step one of the five-step analysis

that Moore had not engaged in substantial gainful activity since her alleged onset date of July 1,

2008. (AR 24). At step two, the ALJ found that Moore had the following severe impairments:

diabetes, diabetic neuropathy, obesity, and depression. (AR 24).

At step three, the ALJ concluded that Moore did not have an impairment or combination

of impairments severe enough to meet or equal a listing. (AR 25). Before proceeding to step

four, the ALJ determined that Moore's symptom testimony was not entirely credible:

> [T]he claimant has the [RFC] to perform light work . . . except she can only
> occasionally balance, stoop, crouch, kneel, crawl, and climb ramps and stairs.
> She can never climb ladders, ropes, or scaffolds. Mentally, she is unable to
> engage in complex or detailed tasks but can perform simple, routine, and
> repetitive tasks consistent with unskilled work. She can sustain and attend to task
> throughout the day. She is limited to superficial interaction with coworkers,
> supervisors, and the public, defined as occasional and casual contact not
> involving prolonged conversation or discussion of involved issues. Contact with
> supervisors still involves necessary instruction.

(AR 27).

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Moore

could perform her past relevant work as a press operator and hand packager. (AR 32). In

addition, the ALJ found at step five that Moore could perform a significant number of other

unskilled light-work jobs in the economy, including repack room worker, stock checker, and

laundry worker. (AR 33). Therefore, Moore's applications for DIB and SSI were denied. (AR

34).

*C.  The ALJ Adequately Accounted in the RFC and Step-Five Hypotheticals for Her Step-Three Finding That Moore Had Moderate Deficits in Maintaining Concentration, Persistence, or Pace*

Moore first argues that the ALJ failed to adequately account in the RFC and in the step-five hypotheticals posed to the VE for the ALJ's step-three finding that Moore had moderate deficits in maintaining concentration, persistence, or pace.  Contrary to Moore's assertion, the assigned RFC and the step-five hypotheticals adequately accounted for her moderate deficits in concentration, persistence, or pace, and thus, Moore's argument does not warrant a remand of the Commissioner's final decision.

To explain, at steps two and three of the sequential evaluation, the ALJ determines the severity of a claimant's mental impairment by assessing her degree of functional limitation in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings.  SSR 96-8p, 1996 WL 374184, at *4 (July 2, 1996).  Relevant to this appeal, the "paragraph B" criteria consist of four "broad functional areas": activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3); *see, e.g.*, *Jones v. Massanari*, No. 01-C-0024-C, 2001 WL 34382025, at *13 (W.D. Wis. Oct. 18, 2001).  "[T]he limitations identified in the 'paragraph B' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process."  SSR 96-8p, 1996 WL 374184, at *4.

"The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C . . . ."  *Id*.; *see Virden v. Astrue*, No. 11-0189-DRH-CJP,

2011 WL 5877233, at *9 (S.D. Ind. Nov. 4, 2011). "RFC is what an individual can still do despite his or her limitations." SSR 96-8p, 1996 WL 374184, at *2; *see* 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1). "The RFC assessment must be based on *all* of the relevant evidence in the case record." SSR 96-8p, 1996 WL 374184, at *5; *see* 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). That is, "[i]n assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 WL 374184, at *5; *see Paar v. Astrue*, No. 09 C 5169, 2012 WL 123596, at *13 (N.D. Ill. Jan. 17, 2012).

Here, when assessing the "paragraph B" criteria at steps two and three, the ALJ concluded that Moore had mild restrictions in activities of daily living and moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace. (AR 26). The ALJ then assigned Moore the following mental RFC:

> Mentally, [Moore] is unable to engage in complex or detailed tasks but can perform simple, routine, and repetitive tasks consistent with unskilled work. She can sustain and attend to task throughout the day. She is limited to superficial interaction with coworkers, supervisors, and the public, defined as occasional and casual contact not involving prolonged conversation or discussion of involved issues. Contact with supervisors still involves necessary instruction.

(AR 27).

Moore asserts that the foregoing restriction is inadequate because it did not expressly include the ALJ's finding at step three that she had moderate difficulties in maintaining concentration, persistence, or pace. Specifically, Moore argues that in most cases, incorporating terms like "simple, repetitive tasks" or "unskilled work" on their own will not necessarily exclude from the VE's consideration those jobs that present significant problems of concentration, persistence, or pace. (DE 16 at 3).

Indeed, the Seventh Circuit Court of Appeals has instructed that "for most cases, the ALJ should refer expressly to limitations on concentration, persistence, and pace in the hypothetical in order to focus the VE's attention on these limitations and assure reviewing courts that the VE's testimony constitutes substantial evidence of the jobs a claimant can do." *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620-21 (7th Cir. 2010); *see, e.g.*, *Miller v. Colvin*, No. 1:11-cv-1186, 2013 WL 796722, at *4 (S.D. Ind. Mar. 1, 2013) (concluding that the case fell within the scope of "most cases" and that the restrictions on concentration, persistence, and pace should have been included in the hypothetical). However, in this particular instance, the assigned RFC and the hypotheticals posed by the VE adequately accounted for the ALJ's finding that Moore had moderate deficits in concentration, persistence, or pace.

To elaborate, in assigning Moore the RFC, the ALJ reasonably relied on the opinions of Drs. Hill and Kladder, the state agency psychologists. In June 2011, Dr. Hill found that Moore had moderate deficits in concentration, persistence, or pace, and then wrote in the narrative section of her opinion that Moore's attention and concentration, although "moderately impacted," were still "reasonable for simple tasks." (AR 613, 619). Dr. Hill further found that Moore could "understand, remember, and carry-out simple tasks within physical limitations"; "relate on at least a superficial basis on an ongoing basis with co-workers and supervisors," "attend to task for sufficient periods of time to complete tasks"; and "manage the stresses involved with work." (AR 619). Dr. Hill's opinion was later affirmed by Dr. Kladder. The ALJ assigned "great weight" to the opinions of Drs. Hill and Kladder—a finding that Moore does not challenge. (AR 31); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 839 (N.D. Ind. 2004) ("The regulations, and this Circuit, clearly recognize that reviewing physicians and psychologist[s] are

experts in their field and the ALJ is entitled to rely on their expertise." (citing 20 C.F.R. § 404.1527(e)(2)(i)); *see also* 20 C.F.R. § 416.927(e)(2).

In *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010), the Seventh Circuit stated that when an ALJ translates a step-three finding of moderate limitations in concentration, persistence, or pace to the RFC, the ALJ should address not only the complexity of the tasks the claimant can perform, but also the claimant's "ability to stick with a given task over a sustained period." *Accord Warren v. Colvin*, 565 F. App'x 540, 544 (7th Cir. 2014). Here, the RFC and the step-five hypotheticals did just that.

The ALJ, relying on the opinions of Drs. Hill and Kladder, crafted an RFC and step-five hypotheticals that mirrored the medical source opinion of these doctors, addressing both the complexity of the tasks Moore could perform and her ability to complete such tasks over a sustained period. To address complexity, the ALJ stated that Moore "is unable to engage in complex or detailed tasks but can perform simple, routine, and repetitive tasks consistent with unskilled work." (AR 27; *see also* AR 97). And to address the ability to stick with a given task over a sustained period, the ALJ stated that Moore "can sustain and attend to task throughout the day." (AR 27; *see also* AR 97). Additionally, in a hypothetical to the VE, the ALJ addressed a further limitation of "low stress jobs, defined as having only occasional decision making required and only occasional changes in the worksetting." (AR 100).

Thus, the ALJ did not run afoul of the Seventh Circuit's instruction in *O'Connor-Spinner* to address both the complexity of the tasks the claimant can perform and the claimant's ability to stick with the tasks over a sustained period. As such, the ALJ adequately accounted for Moore's moderate deficits in concentration, persistence, or pace. *See Milliken v. Astrue*, 397 F. App'x

218, 222 (7th Cir. 2010) (concluding that the assigned RFC for unskilled work adequately

accounted for the claimant's moderate difficulties in concentration, persistence, or pace, where a

medical source opined that the claimant could perform unskilled work despite her deficits in

concentration, persistence, or pace); *Johnson v. Barnhart*, 314 F.3d 283, 288-89 (7th Cir. 2002)

(affirming the ALJ's RFC where he relied on a medical source opinion who found that despite

the claimant's moderate limitations in the ability to maintain a regular schedule and complete a

normal workday, the claimant could still perform low-stress, repetitive work); *Marley v. Colvin*,

No. 1:14- cv-157, 2015 WL 3999484, at *4-6 (N.D. Ind. July 1, 2015) (finding that the ALJ

adequately accounted for the claimant's moderate deficits in concentration, persistence, or pace

where the ALJ relied on a medical source opinion indicating that the claimant could perform

simple work and could "attend to task for sufficient periods of time to complete tasks").

Moreover, at the hearing, the VE testified that a hypothetical individual with Moore's

education, experience, and RFC could perform not only her past relevant work as an operator

and hand packager as she actually performed it, but also a significant number of other unskilled

light jobs (repack room worker, stock checker, and laundry worker) and unskilled sedentary jobs

(sorter, final assembler, and spotter) in the economy. (AR 97-100). The VE further testified that

the hypothetical individual could still perform those jobs even if she were "further limited to low

stress jobs, defined as having only occasional decision making required and only occasional

changes in the work setting[.]" (AR 100). Therefore, on this record, the Court concludes that

the ALJ adequately accounted in her step-five hypotheticals for Moore's moderate difficulties in

concentration, persistence, or pace and did not commit reversible error. *See Fisher v. Bowen*,

869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense

requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." (citations omitted)).

### D. The ALJ Adequately Considered the Combined Effects of Moore's Impairments

Next, Moore argues that the ALJ failed to consider the combined effects of her impairments, in particular, her obesity and mental problems.  Contrary to Moore's assertion, "[n]o evidence in the record suggests that the ALJ failed to consider the combined effects of [Moore's] impairments."  *Robinson v. Apfel*, No. 97 C 8727, 1999 WL 160068, at *7 (N.D. Ill. Mar. 12, 1999).

Rather, the ALJ specifically explained at step three that Moore did not have "an impairment *or combination of impairments*" that met or equaled a listing.  (AR 25 (emphasis added)).  The ALJ specifically addressed Moore's obesity at that step, explaining that she had considered obesity in accordance with Social Security Ruling 02-1p, which instructs an ALJ not to "make assumptions about the severity or functional effects combined with other impairments." (AR 25 (quoting SSR 02-1p, 2002 WL 34686281, at *6 (Sept. 12, 2002)).  The ALJ also stated that in rendering her decision she had "fully considered obesity in the context of the overall record evidence."  (AR 25).

And in the RFC finding, the ALJ stated that she "must consider *all* of the claimant's impairments" (AR 24 (emphasis added)), and that she had, in fact, "considered *all* symptoms . . . ."  (AR 27 (emphasis added)).  The ALJ then wrote a second paragraph about Moore's obesity, noting Moore's body mass index of 40.77 and that SSR 02-1p considers such a body mass index "extreme" obesity and at "the greatest risk for developing obesity-related impairments."  (AR 29).  The ALJ acknowledged that "the combined effects of obesity with other impairments may

23

be greater than might be expected without obesity." (AR 29). The ALJ then stated: "[Moore's] obesity has been taken into consideration in the limitations assessed and the determination that [she] has been limited to a reduced range of light work activity." (AR 29). The ALJ also noted that despite Moore's complaints of back and joint pain, neuropathy, diabetes *and obesity*, the majority of physical examinations of record revealed full strength, sensation, movement, and gait. (AR 29).

As to Moore's mental impairments, the ALJ penned a lengthy paragraph discussing Moore's physical and mental limitations in combination. (AR 27). The ALJ acknowledged that Moore alleged disability based on "diabetes, high blood pressure, neuropathy, *and depression*." (AR 27 (emphasis added)). The ALJ then reviewed Moore's testimony of various limitations, including "back, foot, and knee pain, general extremity pain, diminished strength, the inability to stand for longer than twenty minutes, the inability to sit for long periods, *depression, dangerous ideations, tearfulness, social withdrawal, and a poor ability to deal with stress . . . .*" (AR 27 (emphasis added)). The ALJ acknowledged Moore's assertion that her "impairments, singularly *and in combination*, preclude her from working." (AR 27 (emphasis added)). The ALJ then penned two additional paragraphs about Moore's mental impairments. (AR 29). In doing so, the ALJ noted that Moore attributed some of her psychological problems to "an inability to cope with her physical restrictions." (AR 29). Furthermore, the ALJ assigned great weight to the opinion of Drs. Hill and Kladder, who in their narrative specifically considered Moore's mental limitations in the context of her physical problems. (AR 601 (stating that Moore's daily living activities were primarily limited by her physical conditions and that she could "understand, remember, and carry-out simple tasks within physical limitations")).

Therefore, contrary to Moore's assertion, there is no indication that the ALJ ignored the cumulative effect of Moore's obesity and mental symptoms when crafting her RFC and the hypotheticals to the VE.[6] *Compare Clifford,* 227 F.3d at 873 ("The ALJ, rather than blind himself to this condition (and other relevant evidence), should have considered the weight issue with the aggregate effect of her other impairments."), *with Lott v. Colvin*, 541 F. App'x 702, 706 (7th Cir. 2013) (indicating that the ALJ's statements that she examined the "combination of impairments" at steps two, four, and five were sufficient to show that the ALJ accounted for the aggregate effect of the claimant's impairments); *Richison v. Astrue*, 462 F. App'x 622, 626 (7th Cir. 2012) (same); *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008) (same); *Johnson v. Barnhart*, 449 F.3d 804, 807 (7th Cir. 2006) ("[T]here is no indication that in assessing [the claimant's] joint problems the [ALJ] gave insufficient weight to the effect on them of [the claimant's] obesity . . . .").

### E. The ALJ's Credibility Determination Will Not Be Disturbed

Finally, Moore argues that the ALJ improperly found her symptom testimony "not entirely credible." (AR 28). More specifically, Moore argues that when assessing her credibility, the ALJ unreasonably evaluated: (1) her testimony concerning her ability to stand, (2) her noncompliance with medication, (3) her weak work history since 2000, (4) her testimony concerning suicide attempts, and (5) her activities of daily living. (DE 5-9). Ultimately,

---

[6] Moreover, as stated earlier, the VE testified that even if a hypothetical individual with Moore's education, experience, and RFC were additionally limited to "sedentary work" and "low stress jobs, defined as having only occasional decision making required and only occasional changes in the work setting[,]" such individual could still perform a significant number of jobs in the economy. (AR 100). Thus, it is unclear what additional limitations Moore believes are warranted as a result of the combination of her impairments that could make a difference in the outcome of her case. *See, e.g.*, *Johnson v. Barnhart*, 449 F.3d 804, 807 (7th Cir. 2006) ("There is no evidence that [the claimant's] obesity would have a *direct* effect on her ability to do sedentary work . . . .").

Moore's challenge to the ALJ's credibility determination, which is entitled to special deference, does not warrant a remand of the Commissioner's final decision.

An ALJ's credibility determination is entitled to special deference because the ALJ is in the best position to evaluate the credibility of a witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and she articulates her analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988) (citation omitted), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006) (citation omitted), her determination will be upheld unless it is "patently wrong," *Powers*, 207 F.3d at 435; *see Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness"); *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1995) ("[Because] the ALJ is in the best position to observe witnesses, [courts] usually do not upset credibility determinations on appeal so long as they find some support in the record and are not patently wrong." (citations omitted)).

The ALJ first found that Moore's allegations lacked credibility because they were inconsistent with the objective medical record. More pointedly, the ALJ observed that Moore's assertion that she could stand no longer than 30 minutes was not supported by the record. (AR 30). Although Moore contends that the ALJ overlooked contrary evidence when making this observation, her argument consists of just two nitpicks of the ALJ's decision. *See Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) (In reviewing an ALJ's decision, the Court will "give the opinion a commonsensical reading rather than nitpicking at it." (citation omitted)).

Moore's first nitpick is that one of the June 2011 examinations (AR 579) cited by the

ALJ did not mention her range of motion or gait. But Moore overlooks that the ALJ cited *two* June 2011 examinations—the first (AR 579) for her observation that Moore reported no pain with medication, just drowsiness, and the second (AR 752) for her observation that Moore demonstrated normal gait and range of motion. Therefore, the ALJ's citations support her findings. Moore also challenges the ALJ's statement that in 2013 she demonstrated a normal gait and full strength and range of motion of the knees and back. (AR 25, 29). She points out that the 2013 examinations revealed that her knee flexion was actually 90 percent of normal and was limited by pain, and that she had mild crepitation and tenderness in her knees. (AR 778, 782, 792). But these minor knee limitations apparently did not affect her gait, which was listed as "normal" on the evaluations. (AR 778, 782, 792). Thus, the ALJ's characterization of the evidence was not unfair because, as the ALJ observed, the majority of the examinations of record revealed full strength and movement and a normal gait. (AR 28-29 (citing AR 461-63, 473, 492, 500, 528, 561, 585, 701, 733, 752, 770, 778, 782)).

Next, Moore argues that the ALJ violated Social Security Ruling 96-7p by discounting her credibility on the basis of her noncompliance with medication without first reviewing the record for possible explanations. 1996 WL 374186, at *7. Moore asserts that the record reveals that she stopped her mental health treatment at the Northeastern Center because she was receiving multiple services in her home through DCS. (DE 16 at 7 (citing 649, 760)). She additionally asserts that despite her noncompliance issues with respect to her diabetes, she did see Dr. Pechin for diabetic treatment, as well as for obtaining mental health medications. (DE 16 at 7 (citing AR 496, 523, 636)).

However, at the hearing the ALJ asked Moore about her noncompliance with

medications. (AR 61). Moore denied any noncompliance, with the exception of a three-month period in 2013 when she lost her insurance. (AR 61). Quite inapposite to that testimony, the record reflects that Moore frequently stopped taking medications on her own and appeared rather uninterested in controlling her blood sugar. (AR 30; *see* AR 357, 437, 442, 559, 584-85, 649, 656, 757, 760). As such, on this record, the ALJ did not error in discounting Moore's credibility concerning her noncompliance with medication. *See Kornfield v. Apfel*, No. 00C 5642, 2003 WL 103009, at *4 (N.D. Ill. Jan.9, 2003) (discounting a claimant's credibility due to her inconsistent statements); SSR 96-7p, 1996 WL 374186, at *5 ("One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record.").

Moore also attempts to fault the ALJ for considering her weak work history since 2000 as a factor, suggesting that her weak work history was attributable to her health and that an ALJ must inquire into the reasons for a claimant's poor work history. Although the Seventh Circuit has held that a poor work history may not count against a claimant when the evidence demonstrates that her medical impairments prevented her from working, *see Sarchet v. Chater*, 78 F.3d 305, 308 (7th Cir. 1996), here there is no such evidence. Moore's alleged onset date is July 1, 2008; thus, Moore stopped working full-time *eight years* before her alleged disability. Moreover, Moore testified that she quit the only full time job she ever had because she lost her babysitter and "it was close to school getting out." (AR 52, 56-57). As such, the ALJ did not err by considering Moore's weak work history since 2000. *See Simila v. Astrue*, 573 F.3d 503, 520 (7th Cir. 2009) (considering, pursuant to 20 C.F.R. § 404.1529(c)(3), that the claimant's declining earnings prior to his onset of his alleged disability was an indicator of a lack of effort

to find work).

Next, Moore argues that the ALJ should not have discounted the credibility of her testimony about her suicide attempt in October 2012. In that regard, the ALJ stated: "[T]he record directly refutes some of [Moore's] statements. For example, at the hearing, she testified that she had an attempt on her own life. However, the record indicates that it was not a serious attempt but rather an effort to get her husband's attention." (AR 30 (citing AR 768)). Although the ALJ's characterization of Moore's suicide attempt appears "a bit harsh," an ALJ's credibility assessment will stand as long as there is some support in the record. *Berger v. Astrue*, 516 F.3d 539, 545-46 (7th Cir. 2008) (affirming the ALJ's credibility determination because it was not "patently wrong" or "divorced from the facts contained in the record," even though some of the ALJ's findings were "a bit harsh"). Here, the ALJ's statement tracks the facts in the record, as the emergency room doctor wrote: "[Patient] states that she took a handful of pravastatin tabs [but did not swallow them] to get her husband[']s attention. She states that they have been having some issues today. Denies suicidal ideation. Denies homicidal ideation." (AR 768). Therefore, although the ALJ's statement appears harsh, it was not "patently wrong" or "divorced from the facts contained in the record." *Berger*, 516 F.3d at 546.

As an additional factor, the ALJ found that Moore's activities of daily living diminished the credibility of her allegations, viewing her performance of household tasks, shopping, financial management, caring for pets, and driving a car as supportive of a finding that she could perform a light level of work activity. Moore, however, argues that the ALJ failed to explain how her rather minimal daily living activities demonstrate an ability to perform light work. The Court agrees that the ALJ went too far when stating that Moore's daily activities were consistent

with a light level of work activity and contradictory to her allegation that she is unable to work. (AR 30). Although it is appropriate for an ALJ to consider a claimant's daily activities as a factor when evaluating her credibility, SSR 96-7p, 1996 WL 374186, at *3; *see Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016) (affirming the ALJ's consideration of the claimant's ability to perform light household chores, drive a car, and shop for groceries when assigning an RFC for light work with limitations), the Seventh Circuit has cautioned that a person's ability to perform daily activities does not necessarily translate into an ability to work full time. *See Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013) (collecting cases); *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) ("The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer."); *Ramey v. Astrue*, 319 F. App'x 426, 430 (7th Cir. 2009) (opining that the claimant's minimal daily activities, which included two hours of house chores punctuated with rest, cooking simple meals, and grocery shopping three times a month, were not inconsistent with her claims of disabling pain). Therefore, the ALJ's reasoning with respect to Moore's daily activities as a factor in her credibility determination was flawed.

The question, then, boils down to whether the ALJ's credibility determination can stand on the other four factors provided by the ALJ and discussed above—all of which are supported by the record. In that regard, the Seventh Circuit has recognized that an ALJ's reasoning need not be perfect. *Halsell v. Astrue*, 357 F. App'x 717, 723 (7th Cir. 2009) ("[A]lthough the ALJ's reasoning is imperfect, there is substantial evidence supporting her decision to discount [the claimant's] credibility."). "[A]n ALJ's credibility assessment will stand 'as long as [there is]

some support in the record.'" *Berger*, 516 F.3d at 546 (alteration in original) (quoting *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)). On balance, the flaw in the ALJ's credibility reasoning concerning Moore's daily activities is not enough to undermine her decision that Moore's testimony was less than fully credible based on the other reasons provided. *See Simila*, 573 F.3d at 517 ("Though the ALJ's credibility determination was not flawless, it was far from 'patently wrong.'"). "Not all of the ALJ's reasons must be valid as long as *enough* of them are, and here the ALJ cited other sound reasons for disbelieving [Moore]." *Halsell*, 357 F. App'x at 722-23 (citations omitted); *see McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011) (affirming the ALJ's credibility determination even though it "was not without fault"). As such, the ALJ's credibility determination, though imperfect, is supported by substantial evidence, and thus, will not be disturbed.[7]

## V. CONCLUSION

For the foregoing reasons, the decision of the Commissioner is AFFIRMED. The Clerk

---

[7] Moore also argues that the ALJ failed to mention certain evidence that favors her credibility, such as that she underwent several foot procedures in 2009 (AR 729), unsuccessfully tried different medications for her neuropathy (AR 464, 564), received several knee injections (AR 687, 690, 694, 704, 714), reported pain at a level eight at the pain clinic (AR 583), and although methadone eliminated her pain, the dosage made her too drowsy and had to be reduced (AR 579). But "an ALJ must articulate, at some minimum level, her analysis of the evidence. She is not required to address every piece of evidence or testimony, but must provide some glimpse into her reasoning." *Dixon*, 270 F.3d at 1176 (citing *Zurawski*, 245 F.3d at 888-89); *see also Clifford*, 227 F.3d at 872. Here, the ALJ's discussion of Moore's medical and treatment history adequately articulates her reasoning at the necessary minimal level.

Moore further asserts that the ALJ failed to properly evaluate the GAF scores of record, which ranged from 45 to 55. (DE 16 at 8-9 (citing AR 437, 568, 648, 651, 744, 756, 766)). But it is difficult to understand how Moore can fault the ALJ on this front, as the ALJ expressly assigned "moderate weight" to Moore's GAF scores. (AR 31). In doing so, the ALJ noted that the GAF scores were merely a snapshot of Moore's abilities on any given day and appeared largely based on Moore's subjective reports of her daily activities. (AR 31). In any event, "GAF scores are more probative for assessing treatment options rather than determining functional capacity and a person's disability." *Curry v. Astrue*, No. 3:09-cv-565, 2010 WL 4537868, at *7 (N.D. Ind. Nov. 2, 2010) (citing *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)). "[N]owhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on [her] GAF score." *Denton*, 596 F.3d at 425 (citation and internal quotation marks omitted); *accord Walters v. Astrue*, 444 F. App'x 913, 919 (7th Cir. 2011); *see Anderson v. Astrue*, No. 1:09-cv-327, 2010 WL 3522574, at *8 (N.D. Ind. Aug. 31, 2010) (affirming the ALJ's discounting of an examining clinician's GAF score as a "snapshot"). Therefore, Moore's assertion of error with respect to the GAF scores of record is unpersuasive.

is directed to enter a judgment in favor of the Commissioner and against Moore.

SO ORDERED.

Enter for this 31st day of March 2016.

/s/ Susan Collins
Susan Collins,
United States Magistrate Judge